HENRY B. AMES AND DORTHA S. AMES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ames v. Comm'r
Docket Nos. 32613-83; 33910-84; 7613-85; 9035-85; 14162-85; 17128-85; 35657-85 United States Tax Court
T.C. Memo 1990-87; 1990 Tax Ct. Memo LEXIS 87; 58 T.C.M. (CCH) 1470; T.C.M. (RIA) 90087; February 26, 1990
Larry K. Hercules and Edward G. Lavery, for the petitioners. Deborah A. Butler and Rebecca W. Wolfe, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: These consolidated cases were assigned to Special Trial Judge Daniel J. Dinan pursuant to section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) *89 of the Code and Rule 180 et seq. [2] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: Respondent determined the following deficiencies and additions to tax in petitioners' Federal income taxes: Taxable
Addditions to Tax
Docket No.
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
32613-83
1980
$ 1,343.00 -0-      -0- -0- 1981
1,554.00
-0-      -0- -0- 33910-84
1981
9,194.00
459.70    * -0- 7613-85 1981
12,104.00
-0-      -0- -0- 1982
12,650.00
-0-      -0- 1,265.00
9035-85 1981
58,156.00
2,908.00    * -0- 14162-85
1981
22,242.00
-0-      -0- -0- 17128-85
1980
539,004.00 **26,950.00    * -0- 1981
2,881,262.00
144,063.00    * -0- 1982
2,399,381.00
119,969.00    *
106,873.00
35657-85
1981
2,953.00
-0-      -0- -0- *90 In his statutory notices of deficiency in docket Nos. 9035-85 and 35657-85, respondent also determined that petitioners were liable for an increased rate of interest under section 6621(d), now section 6621(c). Respondent also raised the section 6621(d) issue in his answer in docket No. 14162-85 and in his amended answer in docket Nos. 33910-84 and 7613-85. The issues for decision are (1) whether petitioners are entitled to deduct interest allegedly incurred in the purchase of timeshare units in vacation homes, (2) whether petitioners are entitled to deduct certain miscellaneous expenses incurred in their purchase of the timeshare units, (3) whether petitioner in docket No. 17128-85 is entitled to deduct depreciation on the timeshare units purchased by it, (4) whether petitioners in docket Nos. 33910-84, 9035-85, and 17128-85 are liable for additions to tax pursuant to sections 6653(a), 6653(a)(1), and 6653(a)(2), (5) whether petitioners in docket Nos. 33910-84, 7613-85, 9035-85, 14162-85, and 35657-85 are liable for an increased rate of interest pursuant *91 to section 6621(d), and (6) whether petitioners in docket Nos. 7613-85 and 17128-85 are liable for additions to tax for the year 1982, pursuant to section 6661. By order dated October 30, 1985, the Court severed certain non-Kilburn issues from the trial of the case at docket No. 17128-85, including additions to tax based solely on non-Kilburn items. In docket No. 33910-84, petitioners concede a $ 94 adjustment for unreported income and respondent concedes a $ 4,110 adjustment with respect to investment interest. In docket No. 9035-85 petitioners concede a $ 655.00 depreciation deduction and a $ 200.00 investment tax credit for the taxable year 1981. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and accompanying exhibits are incorporated herein by this reference. At the time they filed their petitions in these cases petitioners' places of residence were as follows: Petitioners
Place of Residence
Henry B. Ames
Ogden, Utah
Dortha S. Ames
James Hildebrand
Studio City, California
Mary G. Hildebrand
Marshall H. Waren
Fayetteville, North Carolina
Sandra Y. Waren
Leland Waltuck
Portland, Oregon
Irene Waltuck
S. Marc Chesser
Lake Mary, Florida
Angela B. Chesser
Howard I. Lukens
Odessa, Texas
*92 Petitioner Forever Living Products, Inc., an Arizona corporation, had its principal place of business in Arizona at the time it filed its petition in its case. Petitioners purchased timeshare units in Kilburn Vacation Homeshares, Inc. vacation homes. The Kilburn homes are located in and around Park City, Utah. Park City, located in Summit County, is approximately 27 miles from Salt Lake City. Summit County is in the Wasatch range of the Rocky Mountains. Park City began as a silver mining town in the 19th Century. The first ski resort opened there during the 1940's. Park City is widely regarded as one of the premier ski areas in the United States receiving approximately 300 inches of snow each year. The ski season is between November and March. The seasons immediately preceding and following the ski season are the off seasons, also known as the shoulder seasons or mud seasons. Although Park City is mainly a destination ski area, it also offers some summer attractions including two professionally designed golf courses, one by Arnold Palmer and the other by Jack Nicklaus. In October 1981, Summit County passed a 6-month moratorium on further timeshare developments. In *93 April 1982, the county passed an ordinance prohibiting further timeshare developments in certain residential areas. The ordinance, however, did not affect timeshares already on the market. The Kilburn timesharing program, to the extent it applies to all petitioners, may be described as follows (the provisions unique to each petitioner are set out later in these findings of fact). Kilburn Vacation Homeshares, Inc., a Delaware corporation, was incorporated on June 17, 1980, by Mr. James M. Clark. On September 10, 1982, the corporation changed its name to Bajan Resorts, Inc.The corporation hereinafter will be referred to as Kilburn. Mr. Clark was the developer of Kilburn. He incorporated it, was an officer of it, and was its sole shareholder. On February 20, 1981, he resigned as an officer of Kilburn but continued to be its sole shareholder. Kilburn owned 52 vacation homes in the Park City area. Forty of these were detached, free-standing houses and the other twelve were condominiums. Eleven of the detached houses were located in Park City, two were close to Park City West Ski Resort, and twenty-seven were in Jeremy Ranch, a development eight miles from Park City. Kilburn *94 converted the vacation homes into timeshares. The original timeshare plan, as structured by Kilburn, was as follows. Each home was divided into 350 days. The remaining 15 days were reserved by Kilburn for maintenance and cleaning. Kilburn sold the available 350 days, known as timeshare units, through dealers, to prospective purchasers. Each purchaser was to receive a 1/350 undivided fee simple interest in the home as a tenant-in-common with all the other purchasers of the timeshare units, and a share of the furniture and personal property in the unit. By the use of restrictive covenants, each purchaser's use of the property was restricted to one day per year. The day of use varied from year to year. This is referred to as a "revolving timeshare unit." The day of use for each year would be known to the purchaser by referring to a list which showed the purchaser's timeshare number and the days of use assigned to that number. For example, if a purchaser was assigned Day #1 in a certain house, he could determine his days of use for each year by referring to a list which showed the days of use for Day #1 to be January 7, 1982, August 17, 1983, October 27, 1984, January 6, 1985, and *95 March 18, 1986. The days of use were determined by the owners' association pursuant to a formula. If a purchaser purchased a block of timeshares, the days assigned to those timeshares would then be rotated as a block. Concurrently with the purchase of a timeshare unit, by virtue of a covenant, the purchaser became a member of the owners' association organized for each vacation home. In the beginning there were seven owners' associations, one for each home in which timeshares were sold. Each owners' association was a Utah not-for-profit corporation. Each timeshare unit purchased entitled the purchaser to one vote. The owners' association levied a dues assessment on all members to pay the common expenses of the property. The owners' association also held a power of attorney for each purchaser and could use it to sell the purchaser's timeshare unit. The owners' association was managed by a Board of Trustees, elected by the members. The trustees adopted bylaws which governed the owners' association. Kilburn, or Mr. Clark, initially controlled the Board of Trustees of the owners' associations. In May 1981, the Homeshare General Owners Association (Association) was formed to *96 maintain, operate, and govern the Kilburn properties. In April 1982, the original seven owners' associations were merged into it. Kilburn, for the most part, did not itself sell the timeshare units to the public. Most of the timeshare units were sold by a dealer known as Affiliated Development Corporation (hereinafter Affiliated) or by secondary dealers who purchased the timeshare units from Affiliated. Affiliated sold the units as a dealer, i.e., it purchased the timeshare units itself and then sold them to prospective purchasers. The timeshare units were sold on contract with a deed to be delivered when the contract was completed, i.e., paid off. None of the contracts were recorded with the County Recorder's Office. The contract had a stated purchase price. It required the purchaser to make a down payment and to then pay off the balance in 30 years with interest. The amount of interest was determined at the outset, and was payable together with the unpaid purchase price as a balloon payment in year thirty. In addition, the purchaser was required under the contract to make interest payments once a year for ten years in a predetermined amount. The annual interest payments *97 were credited against the amount of accrued interest. The purpose of the ten annual interest payments was to supply Kilburn with sufficient cash to pay its obligation on the underlying mortgage it had on the property. For sales beginning in 1981 the seller earned interest under the Rule of 78's. [3] If a purchaser desired to pay off the contract prior to year thirty that purchaser would have to pay an amount of interest as accrued using the Rule of 78's. There is no evidence in the record that any of petitioners sought alternative financing. They all readily accepted the financing offered by the Kilburn Timeshare promoter, Mr. Clark. The contract was nonrecourse. The purchaser could *98 forfeit his interest in the timeshare unit at any time without personal liability. Naturally, if the value of the timeshare in year thirty was less than the amount due on the balloon payment the purchaser would forfeit his interest in the timeshare unit rather than make the balloon payment. Kilburn would not sell timeshare units to individuals. Accordingly, all noncorporate purchasers were required to form a partnership and purchase timeshare units through the partnership. The stated reason for not allowing individuals to purchase timeshares was to avoid interest rate limitations imposed by Utah usury laws. Each purchaser in the chain of title from Kilburn to petitioners' partnerships was covered by a title insurance policy. Initially, in 1980, the title insurance policies were issued through an insurance agency known as Utah Title Company. In April 1981, policies began to be issued through an agency known as Alta Title Company (hereinafter Alta). Generally, individuals interested in purchasing Kilburn timeshare units would appoint Alta as their agent to handle the details of purchasing a timeshare unit. Alta, upon being appointed as an agent, would form a partnership on *99 the purchasers' behalf and then purchase the timeshare units from a dealer on behalf of the partnership. Alta would sign the real estate contract on behalf of the partnership. The partnerships elected the accrual method of accounting. This allowed the partnerships to claim a large interest deduction on accrued interest which would not be paid, if at all, until year thirty. The deduction ratio was 8:1, i.e., an eight-dollar deduction for each one dollar actually invested. Petitioners allegedly purchased the timeshare units for investment purposes only. However, Kilburn itself did not act as a rental agent for the purchasers. In fact, Kilburn was not involved in renting the timeshare units at all. The purchasers normally would hire a rental agent who would try to rent out the units for the purchasers. The rental agent would charge as a commission a percentage of the rent received for the rental. On occasion the rental agent also charged an up-front fee. By an amendment to real estate contract dated September 29, 1983 (the amendment), Kilburn changed the timeshare owner's interest in the vacation home from tenant-in-common to that of a licensee under a 99-year floating license. *100 The stated reason for the change was that many purchasers had defaulted on their contracts resulting in substantially less money being paid to Kilburn in the form of annual interest payments. If Kilburn did not have a sufficient cash flow, it would have to default on the underlying mortgage obligation on the properties. Kilburn wanted to consolidate the purchasers' timeshare units into fewer houses and to sell off the remaining houses to generate cash. For example, if there were 100 timeshare units sold in each of three houses, Kilburn could consolidate those 300 timeshare units into floating licenses in one house and the remaining two houses could be sold off. The amendment to the original real estate contract provided that Kilburn had acquired, or would acquire, the right, title, and interest of the seller (dealer) in the contract. In effect, as of the date of the amendment, Kilburn was the "seller" referred to in all of the original sales contracts. The timeshare owners were to exchange their 1/350 undivided interest as tenants-in-common in certain real property, furniture, and personal property for new timeshare units defined as "a license and privilege to occupy and use *101 one of the dwellings * * * for a period of one day per calendar year on a date during each such calendar year specified by Kilburn annually on or before January first of each year for a total period ending December 31, 2082." Title to the furniture and personal property located in the timeshare unit was to be retained by Kilburn. Mr. Clark decided that the term of payment for the new timeshare units would be 45 years. The final date of payment, however, was to fluctuate in accordance with the formula 1815/index which was tied to the prime rate of interest as reported in the Wall Street Journal. The numerator of the formula was calculated by multiplying 16,500 days (approximately 45 years) by 11 percent, the prime rate as of September 29, 1983. Thereafter, when there was a change in the prime rate, final payment date would be redetermined, e.g., if the prime rate changed to 13 percent, the final payment date would be 38-1/4 years from September 29, 1983 (1815/.13 = 13961.53/365 days = 38.25 years). If the prime rate changed to 9 percent, the final payment date would be 55-1/4 years from September 29, 1983 (1815/.09 = 20166.66/365 days = 55.25 years). If the prime rate increased, *102 the term of the loan would be shortened and Kilburn would receive a higher actuarial rate of interest. If the prime rate decreased, the term of the loan would be extended and Kilburn would receive a lower actuarial rate of interest. The payments to be made under the amendment were attached as an exhibit to each written Amendment To Real Estate Contract that was submitted to the various owners of timeshare units. The exhibit attached to petitioners James Hildebrand and Mary G. Hildebrand's amendment is set out below: EXHIBIT II to Amendment to Real Estate Contract Dated September 29, 1983 Item 1 - Buyer: Em-Jay Partnership, a Utah partnership whose address in Utah is P O Box 2007, Park City, UT 84060. For purposes of notice hereunder, the address shall be c/o James E. Hildebrand 12664 Sarah Street Studio City, CA 91604 Item 2 - Contract Identification: That certain Real Estate Contract by and between EW & NJ Partnership, as seller and Em-Jay Partnership, as buyer dated 10/19/81 involving Kilburn Vacation Homeshare Timeshare Units. Item 3 - Days of possession per year: 5 Item 4 - Balance owing: $ 12,000.00 Item 5 - Annual payment: $ 2,375.00 Item 6 - Annual payment *103 date: 04/01/84 Item 7 - Last annual payment date: 04/01/91 Item 8 - Annual interest accrual: $ 15,750.00 Item 9 - Amount designated as "A" in the formula: $ 44,987.63 Item 10 - Reduced annual interest accrual: $ 8,500.00 On October 19, 1981, petitioners Mr. and Mrs. Hildebrand, through their partnership, Em-Jay, purchased five timeshare units. Those timeshare units were to be exchanged for five new timeshare units each valued at $ 2,400 according to an appraisal report submitted to Kilburn in August 1983, by Resort & Urban Property Appraisers (RUPA). Item 4 represents the price of the five new timeshare units ($ 2,400 X 5 = $ 12,000). Item 5 is the amount required to be paid to Kilburn each year ($ 475 per timeshare unit, beginning on the date stated in Item 6 and ending on the date stated in Item 7). Item 8 represents the amount of interest that would be accrued annually until a reserve, provided for in the amendment (described infra) was funded. Item 10 represents the amount of interest that would accrue annually after the reserve was funded until the note is finally paid. [4]
*104 Item 9 is the amount of the nonrecourse note to be signed by the owner of the timeshare unit at the time the amendment is executed. The amount was determined by subtracting from the outstanding balance due on the note under the original contract, as of September 29, 1983, $ 2,400 times the number of timeshare units the owner would have after signing the amendment. As noted, supra, $ 2,400 was the value of one timeshare unit as determined by RUPA. The amendment also provided for the establishment of a reserve fund for the payment of the balance of accrued interest and principal due under the amended contract. To fund the reserve, the purchaser of each timeshare unit was required to pay into the fund $ 50 for each timeshare unit purchased. In addition, the purchaser was required to pay into the reserve 40 percent of the annual gross income from the rental of timeshares, if any, accruing after January 1, 1984, until the fund exceeded a sum determined by a formula set forth in the amendment. The amendment further provided that as to timeshare units purchased pursuant to the amendment, no membership or voting rights in the Association were to be acquired by the purchaser. *105 It appears from the record that, at least as of September 29, 1983, the Association was controlled by Kilburn. The deduction ratio under the amendment was reduced to 6:1, i.e., a six-dollar deduction for each one dollar actually invested. Approximately 50 percent of those who owned timeshares in 1983 refused to sign the amendment. If the timeshare unit owned was designated to be in a house that Kilburn wished to sell, Kilburn sold its underlying interest in the house and the Association sold the timeshare owner's interest in the house as the owner's attorney-in-fact. Thus, those timeshare unit purchasers who thought they had purchased a fee simple interest in property had that alleged interest sold out from under them by the Association. In 1984, a large percentage of those who refused to sign the amendment failed to make their payments under the original contracts and Kilburn foreclosed on their interests in the property. In other instances, where the Association sold the recalcitrant timeshare owners' interests in the Kilburn properties, it was Kilburn, exercising its control over the Association, that actually effected the sales. The Kilburn timeshares involved in these *106 cases were purchased in 1980 or 1981. Kilburn had assembled promotional brochures for both years. The 1980 brochure explained the program and listed the rotating days of usage for 1980-1984. It also contained a sample of the restrictive covenants pertaining to the timeshare units, the articles of incorporation and bylaws of the owners' association, house rules, a sample purchasing agreement, a projected timeshare unit appreciation based upon appreciation rates ranging from 0 percent to 22.5 percent, and articles on inflation and credit. The promotional brochure used in 1981 included all the information contained in the 1980 brochure and also included an appraisal by Clyde E. Williams of the values of the timeshare units. Mr. Williams had been hired by Kilburn to do the appraisal. The brochure also contained an analysis by JPS Financial Consultants (hereafter JPS) of the Park City economy, its projected growth and projected appreciation potential for the timeshare units. The brochure also contained a sample payoff schedule showing the balloon payment, yearly payments, and the prepayment accrued interest per year. In addition, the brochure contained a form partnership agreement, *107 a letter from the law firm of Hercules & Lavery wherein they promised to represent Kilburn investors in the event the IRS questioned the purchasers' deductions pertaining to the timeshare units, a letter from a C.P.A. explaining how to set up a Utah partnership, an agent-appointment form, and a tax opinion from Wolfson & Wolfson, Co., L.P.A. which explained the tax benefits available to persons who purchased Kilburn timeshare units. Mr. Clark also hired the accounting firm of Coopers & Lybrand to give him a tax opinion regarding the Kilburn program. The accounting firm released what it referred to as a tax analysis which discussed various issues regarding the project but did not come to a conclusion as to whether the IRS would allow the deductions. Although the analysis was not made a part of the promotional material, it was seen and relied on by many of the petitioners in these cases. We will now turn to petitioners individually to find out exactly what they purchased. Petitioners Henry Boyd Ames and Dortha S. Ames formed Ames & Ames partnership on December 30, 1980. Mr. and Mrs. Ames each had a 50-percent interest in the partnership. On that same date the partnership purchased *108 one timeshare unit in Lot #160, Prospector Park Subdivision, Phase III (House #6). House #6 is a two story, full basement, detached house with three bedrooms and 2779 square feet of living space. The stated purchase price was $ 2,775.00. The contract required a down payment of $ 650.00 with the balance of $ 2,125.00 to be paid as follows: $ 415.00 each year for ten years with the entire balance of principal plus interest due in 30 years. Payments were to be applied to interest first. Interest was charged as follows: 188 percent interest would accrue on that portion of the unpaid purchase price still owing as of December 31, 1990. Beginning December 31, 1990, interest still accrued at 188 percent on the unpaid purchase price. Beginning December 31, 1994, interest would accrue at 47 percent on the unpaid purchase price. On their 1980 joint return, petitioners reported accrued interest of $ 3,395. This amount would continue to accrue annually until 1994. From 1994 until year thirty, interest would accrue at $ 998.75 per year. The amount due in year 30 is $ 69,475. [5]
*109 The partnership listed the timeshare unit for rental with Inter-Mountain Lodging Reservation Center for 1981-1984. The partnership also listed the timeshare unit for rental with Fun Country Reservations, Inc. for 1982 and 1983. Neither Mr. Ames nor the rental agents were able to rent the timeshare unit. By an amendment to the original contract, Mr. Ames converted the partnership's ownership interest from a fee simple interest to a floating license on September 29, 1983. Petitioners Leland Waltuck and his wife Irene Waltuck appointed Alta as their agent on December 22, 1981. On December 30, 1981, Alta executed a partnership agreement on behalf of Mr. and Mrs. Waltuck forming a partnership know as Walco Investments. Mr. and Mrs. Waltuck each had a 50-percent interest in the partnership. Also, on December 30, 1981, Alta purchased, on behalf of Walco Investments, 20 timeshare units in Lot #1032, Jeremy Ranch Plat B (House #31). The house is a two story, full basement, detached house with four bedrooms and 2483 square feet of living space. The sale price was $ 3,600 per timeshare unit. The contract required a down payment of $ 800 per unit with the balance of $ 2,800 to be financed *110 as follows: 10 annual payments of $ 570.00 per year per unit and a total finance charge (interest) of $ 89,600 due in 30 years. In the event of prepayment, interest was due under the Rule of 78's. On their joint return for 1981, petitioners Waltuck deducted $ 115,613 or $ 5,780.65 per unit as accrued interest. Walco Investments listed the timeshare units with Paine-Christensen Rental Co. to rent for 1982 and 1983. That agreement was cancelled effective 1983. Walco Investments then listed the timeshare units with Fun Country Reservations, Inc., beginning January 1983. Fun Country rented Walco Investment's timeshare units for four days, December 27-30, 1982. After subtracting commissions, Walco Investments received $ 364.50 in rent for that four-day period. Fun Country rented Walco Investments' timeshare units from March 13-19, 1983 and from March 26-31, 1983. This was a total of 13 out of the 20 days available. After subtracting commissions, the partnership received net rents of $ 1,642.50 for those 13 days in 1983. Walco Investments signed an amended contract in 1984, converting its fee simple ownership interest in the timeshare units to floating licenses. Walco Investments *111 rented five days in 1984 and 14 days in 1985 through their new rental agent. Petitioners S. Marc Chesser and Angela B. Chesser appointed Alta as their agent on September 3, 1981. On September 9, 1981, Alta executed a partnership agreement on behalf of Mr. and Mrs. Chesser forming a partnership known as S. Marc and Angela B. Chesser, Ptrs. Mr. and Mrs. Chesser each had a 50-percent interest in the partnership. Also, on September 9, 1981, Alta purchased on behalf of the partnership 10 timeshare units in Lot #87, Prospector Park Subdivision, Phase II (House #9). House #9 is a two story, no basement, detached house with four bedrooms and 2,615 square feet of living space. The sale price was $ 3,150 per timeshare unit. The contract required a down payment of $ 700 per unit with the balance to be financed as follows: 10 annual payments of $ 500 per year per unit with a total finance charge (interest) of $ 78,400 due in 30 years. In the case of prepayment, interest was due under the Rule of 78's. On their joint return for 1981, petitioners deducted $ 50,581 or $ 5,058.10 per unit as accrued interest. The partnership rented five days to Mr. Chesser's accounting partnership in 1982. *112 No other days were rented. The partnership forfeited its timeshare units in 1983. Petitioner Marshall H. Waren (Sandra Y. Waren is a petitioner herein solely because she filed a joint return with Mr. Waren) along with James F. Soffe and Joseph P. Riddle appointed Alta as their agent on December 22, 1981. Alta executed a partnership agreement on behalf of Messrs. Waren, Soffe and Riddle forming a partnership known as High Flier Associates. Mr. Waren held a 31.9 percent interest, Mr. Soffe held a 27.2 percent interest and Mr. Riddle held a 40.9 percent interest in the partnership. On December 27, 1981, Alta purchased on behalf of the partnership 22 timeshare units in Lot #147, Prospector Park Subdivision, Phase II (House #11). House #11 is a two story, no basement, detached house with three bedrooms and 3019 square feet of living space. The purchase price was $ 2,775 per unit. The contract required a down payment of $ 650 per unit with the balance of $ 2,125 to be financed as follows: $ 465 per year per unit for 10 years with a total finance charge (interest) of $ 72,000 due in thirty years. In the case of prepayment, the amount of interest due was determined under the Rule *113 of 78's. On their joint 1981 and 1982 returns, petitioners deducted Mr. Waren's 31.9 percent proportional share of accrued interest in the amounts of $ 32,599.57 or $ 1,481.80 per unit and $ 31,291.35 or $ 1,422.23 per unit, respectively. The partnership entered into an agreement with Paine-Christensen Rental Co. to list the units for rental. The partnership received net rentals of $ 750 for 1982 for a five-day rental. The partnership changed its rental agent to Fun Country Reservations, Inc. in June 1983. The partnership amended its contract on September 29, 1983, converting its fee simple ownership interest into a floating license. The partnership received rental income in an undisclosed amount in 1984. Petitioners James E. Hildebrand and Mary G. Hildebrand appointed Alta as their agent on September 9, 1981. On October 19, 1981, Alta executed a partnership agreement on behalf of Mr. and Mrs. Hildebrand forming a partnership known as the Em-Jay Partnership. Petitioners each had a 50-percent interest in the partnership. On that same date, Alta purchased, on behalf of the partnership, five timeshare units in Lot #122, Jeremy Ranch Plat #1 (House #12). House #12 is a two story, *114 no basement, detached house with four bedrooms and 2394 square feet of living space. The purchase price was $ 3,150 per timeshare unit. The contract required a down payment of $ 700 per unit with the balance of $ 2,450 to be financed as follows: $ 500 per year per unit for ten years with a total finance charge (interest) of $ 78,400 due in 30 years. In the case of prepayment the amount of interest due was determined under the Rule of 78's. On their joint return for 1981, petitioners deducted $ 25,290 or $ 5,058 per unit as accrued interest. The partnership used Paine-Christensen as its rental agent in 1982 and used Fun Country Reservations, Inc. as its rental agent in 1983. The partnership rented its five days in 1982 for $ 500 and rented its five days in 1983 for $ 600. The partnership converted its fee simple ownership in the timeshare units to a floating license by an amendment to its real estate contract on September 29, 1983. Petitioner Howard Lukens, along with 17 other individuals, appointed Alta as their agent on December 21, 1981. On December 21, 1981, Alta executed a partnership agreement on behalf of petitioner and the 17 others forming a partnership known as *115 Univestors in Utah. Petitioner had a 4.6-percent interest in the partnership. On December 29, 1981, Alta, on behalf of the partnership, purchased 27 timeshare units in Lot #1033, Jeremy Ranch Plat B (House #30). House #30 is a tri-level, full basement, detached house with five bedrooms and 2,323 square feet of living space. The purchase price was $ 3,600 per timeshare unit. The contract required a down payment of $ 800 per unit with the balance of $ 2,800 to be financed as follows: 10 annual payments of $ 570 per unit and a total finance charge (interest) of $ 89,600 due in 30 years. In the event of prepayment the amount of interest due is determined under the Rule of 78's. On his joint return for 1981 petitioner Lukens deducted $ 7,179.54 or $ 265.91 per unit as his 4.6-percent proportional share of accrued interest. The partnership used Paine-Christensen as its rental agent for 1982. The partnership received $ 150 in net rental income in January 1983. The partnership converted its fee simple ownership in the timeshare units to a floating license by an amendment to its real estate contract on September 29, 1983. Rax Maughan formed petitioner Forever Living Products, Inc. *116 (hereinafter FLP) in May 1978. Mr. Maughan was originally a 50 percent shareholder but became FLP's sole shareholder in September 1982. FLP began as a multi-level sales organization selling natural health and beauty products, mainly aloe vera and bee products. Mr. Maughan wanted to expand FLP's business to include resort properties. To that end he hired Tom Mace in 1980 to run the resort properties. Mr. Mace had an extensive background in managing resort properties. A division of FLP has continued to acquire and hold resort properties throughout the western portion of the United States. Rjay Lloyd, a childhood friend of Mr. Maughan, was FLP's attorney. Mr. Lloyd mentioned the Kilburn timeshares to Mr. Maughan. The two then went to Park City to investigate the properties. Mr. Lloyd and his wife Ann Lloyd were co-owners of a partnership known as Lloyd and Lloyd. Lloyd and Lloyd purchased Kilburn timeshare units as a dealer and then resold them to FLP. Lloyd and Lloyd later became known as Rjay and Ann Enterprises. On December 17, 1980, FLP purchased 54 timeshare units in Lot #43 Silver Springs (1A) Subdivision (House #3). House #3 is a two story, no basement, detached *117 house with four bedrooms and 2992 square feet of living space. The total purchase price was $ 127,980. The contract required a total down payment of $ 32,400 and the balance of $ 95,580 to be financed as follows: annual payments of $ 22,950 per year for 10 years plus interest of 209 percent for years 1980-1990 and 1990-1994, respectively, and interest of 56.5 percent each year thereafter until 2009. The entire principal and interest is due December 31, 2009. Also, on December 17, 1980, FLP purchased 54 timeshare units in Lot #98 Prospector Park Subdivision, Phase II (House #4). House #4 is a two story, no basement, detached house with four bedrooms and 2623 square feet of living space. The total purchase price was $ 133,380. The contract required a total down payment of $ 32,400 with the balance of $ 100,980 to be financed as follows: annual payments of $ 22,950 per year for ten years and interest of 198 percent for the years 1980-1994 and interest of 54 percent thereafter until the balloon payment is paid. The entire principal and accrued interest is due December 31, 2009. On December 29, 1981, FLP purchased 53 timeshare units in lot #82 Jeremy Ranch Plot #1 (House #35) for *118 $ 3150 per timeshare unit. House #35 is a two story, no basement, detached house with four bedrooms and 2623 square feet of living space. The contract required a down payment of $ 700 per unit with the balance of $ 2,450 to be financed as follows: $ 500.00 per year per unit for 10 years and a total finance charge (interest) of $ 78,400 due in 30 years. On December 29, 1981, FLP also purchased 64 timeshare units in Lot #1036, Jeremy Ranch Plat B (House #28) a two story, full basement, detached house with four bedrooms and 2394 square feet of living space; 324 timeshare units in lot #65, Jeremy Ranch Plat #1 (House #36), a tri-level, full basement, detached house with five bedrooms and 2323 square feet of living space; 9 timeshare units in lot #130 Jeremy Ranch Plat #1 (House #20), a two story, full basement, detached house with five bedrooms and 2706 square feet of living space; 84 timeshare units in lot #1033 Jeremy Ranch Plat B (House #30), a tri-level, full basement, detached house with five bedrooms and 2323 square feet of living space; and 166 timeshare units in lot 54, Jeremy Ranch Plat #1 (House #38), a tri-level, full basement, detached house with five bedrooms and 2,323 square *119 feet of living space. The purchase prices and financing terms for timeshare units described in the preceding paragraph are identical to the purchase price and financing terms of the timeshare units purchased by FLP in House #35. As noted, supra, in 1982 the individual owners' associations (each house had its own owners' association) were merged into one owners' association known as the Homeshare General Owners Association (the association). Rjay Lloyd became the president of the association. Because of the local rental agents' lack of success in renting the FLP's timeshare units, Mr. Maughan decided to form his own rental agency. To that end he formed Fun Country Reservations, Inc., later known as Fun Country Resorts, Inc. (sometimes hereinafter referred to as Fun Country). All of the shareholders of Fun Country were FLP executives. On February 24, 1982, the association signed a contract with Fun Country providing that Fun Country would act as a rental agent for those purchasers who wanted to list their timeshare units with Fun Country. Over 60 percent of the timeshare owners signed up with Fun Country. Fun Country undertook a serious effort to rent the timeshare units. *120 This included advertising in magazines, contacting travel agents, and traveling to ski shows. Paine-Christensen completely stopped acting as a rental agent in 1983. FLP received no rental income from its timeshare units for 1980 or 1981. It did, however, receive $ 1,405.70 in gross rents for 1982. FLP claimed interest deductions on its corporate returns in the amounts of $ 399,702, $ 3,590,352 and $ 3,822,322 for the taxable years 1980, 1981 and 1982, respectively. FLP also deducted other expenses for the taxable year 1981 in the amount of $ 29,265, including depreciation of $ 23,585.84 and for the taxable year 1982 in the amount of $ 217,200, including depreciation of $ 184,841.55. FLP did not sign the September 29, 1983, amendment to convert its fee simple interests to floating timeshare licenses and abandoned its interests in the Kilburn timeshare units. The following table is a summary of the total purchase price, down payment, and financing charges of each partnership's timeshare units: Purchase
Down
Annual
Balloon
Partnership
Price
Payment
Balance
Payment
Payment
Ames & Ames
$ 2,775    $ 650    $ 2,125  $ 465    $ 69,475   Em-Jay
15,750
3,500
12,250
2,500
404,250
High Flier
Associates
61,050
14,300
46,750
10,230
1,630,750
Walco
Investments
72,000
16,000
56,000
11,400
1,848,000
Univestors
in Utah
97,200
21,600
75,600
15,390
2,494,800
S Marc &
Angela B.
Chesser, Ptrs.
31,500
7,000
24,500
5,000
808,500
FLP 1980
127,980
32,400
95,580
22,950
3,672,540
133,380
32,400
100,980
22,950
3,688,524
FLP 1981
2,205,000
490,000
1,715,000
350,000
56,595,000 *121 Kilburn determined the purchase price of the timeshare units, at least in part, by using appraisals done by Clyde E. Williams. Kilburn hired Mr. Williams to determine values of the timeshare units in 1981. The method Mr. Williams used to determine the value of the timeshare units is as follows. He first determined what the property would be worth had it not been converted to timeshares, in other words, what it would be worth as a single family residence. He then determined a value ratio which was based on the premise that property timeshared is worth more than the value of the underlying property itself. He then multiplied the underlying value of the property by the value ratio and then divided that product by 365 to determine the value of a one-day timeshare unit. To determine the value of the underlying property he used the cost approach and the market value or comparable sales approach. He did not use the income capitalization approach because he said there was insufficient data to use that method of valuation. To demonstrate Mr. William's valuation method, we will set forth his analysis of lot #160 Prospector Park. He determined that the lot would cost $ 38,500, the *122 site improvements would cost $ 2,000 and the building would cost $ 161,690 for a total cost of $ 202,190 which he rounded to $ 202,000. He assumed that the property was unencumbered. This valuation method is the cost approach. Under the market value approach he compared the subject property to three comparable properties that had been sold and determined a value of $ 202,000. The next step was to determine what the property would be worth as timeshare property. To do this he used data pertaining to a condominium which had been converted to timeshares. He multiplied the sale price of a one-week condominium timeshare by 52 weeks and then divided that product by the underlying value of the property. That amount is what Mr. Williams referred to as the value ratio. It represents the ratio by which the sum of the value of each timeshare unit exceeds the value of the underlying property. For example, his data showed that the normal market value of a four bedroom condominium (year-round unrestricted use) was $ 76,000. However, if that condominum was converted to timeshares, his data showed that a one-week timeshare would sell for $ 7,250. The sum of 52 one-week timeshares, therefore, *123 would be $ 377,000 which is 4.96 times the value of the underlying property ($ 76,000). After making certain adjustments, Mr. Williams arrived at a final adjusted value ratio of 5.06. To arrive at a value for the Kilburn timeshares he multiplied the underlying value of one day of the property, $ 547.95 ($ 200,000/365 = $ 547.95) by the value ratio of 5.06 for a total of $ 2,775 (rounded). This, in Mr. Williams' opinion, was the value of a one-day timeshare in the subject property. His appraised value for each timeshare unit involved in these cases, and the corresponding actual sale price is as follows: Purchaser
House Number
Purchase Price
Appraised Value
Ames & Ames
6 $ 2,775 $ 2,775 Walco
31
3,600   3,850   Chesser, Ptrs.
9 3,150   2,750   High Flier
Associates 11
2,775   2,900   Em-Jay
12
3,150   3,750   Univestors
30
3,600   3,950   FLP
3 2,370   2,370   FLP
4 2,470   2,470   FLP
35
3,150   3,800   FLP
28
3,150   3,800   FLP
36
3,150   3,950   FLP
20
3,150   3,950   FLP
30
3,150   3,950   FLP
38
3,150   3,950   *124 Kilburn also hired Kathleen Conroy to appraise the timeshare units involved in these cases. Ms. Conroy testified on behalf of petitioners as an expert witness as did Mr. Williams. Ms. Conroy did not use the comparable sales method for valuing timeshares because she found a lack of comparable properties in Park City. The method she did use was the "rental payback method." The theory behind the rental payback method is that an individual is willing to pay for a timeshare an amount equivalent to what it would cost him/her to rent similar vacation accommodations over a number of years. In her appraisals she used a 15-year payback period and assumed that the rental value of the unit would increase at a rate of 10 percent per year. Ms. Conroy valued one timeshare unit in Lot 72, as of January 1, 1982, at $ 3,190. At trial she also valued other Kilburn timeshares as follows: House Number
Valuation Date
Appraised Value
6 12/30/80
$ 2,516
31
12/21/81
2,768  9 09/08/81
2,914  11
12/27/81
3,190  12
10/19/81
2,692  3 12/17/80
2,452  4 01/01/81
2,736  35
12/29/81
2,768  28
12/29/81
2,768  36
12/29/81
2,920  20
12/29/81
2,290  30
12/29/81
2,920  38
12/29/81
2,920  *125 Respondent also retained the services of an expert to give an opinion as to the value of the timeshare units as of 1980-81. Michael Greene, respondent's expert, basically used two approaches in determining value. He first used the comparable sales approach. Mr. Greene admitted, as did the other experts who testified at trial, that there were no precise comparable sales during the years in issue. The closest comparable sales were smaller (one- and two-bedroom with much less square footage) condominum timeshare units. It was Mr. Greene's opinion that the value of a timeshare unit depends primarily on the number of bedrooms, not the square footage of the unit. For example, Mr. Greene determined that two-bedroom condominiums were worth $ 9,000 for a one-week timeshare unit. To adjust this to a five-bedroom Kilburn timeshare unit in Jeremy Ranch Mr. Greene added $ 2,000 for the third bedroom, $ 2,000 for the forth bedroom, and $ 1,500 for the fifth bedroom for a total of $ 14,500 for a one-week timeshare interval, or $ 2,071 for a one-day timeshare unit as of 1986. [6]
*126 Mr. Greene also used the gross revenue multiplier method, which is a capitalization of the rental income from the property. He determined what the rental rates were for single family homes in the Park City area by season and then averaged them into one rate. This is in keeping with the fact that the Kilburn timeshare units' days of usage rotated from year to year. He determined that a three-bedroom home would rent for $ 153/day, a four bedroom would rent for $ 186/day, and a five bedroom would rent for $ 232/day. He then determined a gross rent multiplier by dividing the market value of certain condominium units by the annual rental price of the units. He then multiplied the rental value of the house by the gross rent multiplier to determine a value of the timeshare units as of 1986. Mr. Greene then adjusted the 1986 value to reflect the 1980 and 1981 purchase dates of the properties in issue by reducing it by an amount equal to the change in the consumer price index over that same period of time. We turn next to the appreciation rates of the timeshare units. The Kilburn promotional materials included an evaluation by JPS on the appreciation possibilities for the timeshare *127 units over time. At trial, petitioners offered Francis Longstaff as an expert in financial analysis. Mr. Longstaff authored two documents dated April 8, 1981 and June 23, 1981, while he was employed by JPS. Those documents purported to analyze the potential economic and financial implications of an investment in the Kilburn timeshare program. The testimony at trial was that these documents were included in the Kilburn promotional material disseminated to potential Kilburn timeshare purchasers. The Court ruled that Mr. Longstaff did not qualify as an expert in 1981 when he prepared the reports and ruled that he could not testify as an expert at trial. However, since potential timeshare purchasers had seen the reports, the Court allowed Mr. Longstaff to testify as a fact witness. The reports were admitted into evidence, not as expert reports, but as documents authored by Mr. Longstaff. In their reports, JPS assumes an inflation rate of nine percent per year for 25 years. While we realized that inflation was raging at very high rates during the years in issue, there is absolutely no support that it would remain that high for 25 years. The JPS report states that a Kilburn *128 investor would receive a return of 13.34 percent under a low-growth scenario and 17.38 percent under a medium-growth scenario. This return appears to be the internal rate of return per year an investor would receive on his investment (the down payment) after the appreciated property is used to pay the balloon payment. The annual interest rate on the financed portion of the purchase price is somewhere between 16 percent to 22 percent, depending on the method used to determine the annual percentage rate. The JPS report predicts that the timeshares would appreciate so much in value that the appreciation would cover the interest payments and still yield a return of 13 percent to 17 percent per year. Petitioners called Mr. George David as an expert to testify as to the possible appreciation rate of the timeshare units. We place no weight on Mr. David's opinion, however, because many of his calculations were patently incorrect. As to Mr. David's report petitioners, in their reply brief filed herein, admit that "it is not possible to tell what the effect would be on the final work product if the calculations were done correctly." ULTIMATE FINDINGS OF FACT We find that the fair *129 market values of the Kilburn timeshare units in petitioners' hands are much less than the purchase price of the timeshares. We further find that the timeshare units would not appreciate to the point where the timeshares' fair marekt value would equal or exceed the balloon payment due in year thirty and that since the financing is nonrecourse, petitioners will forfeit their interests in lieu of making the balloon payment in year thirty. OPINION Respondent's determination in his statutory notice of deficiency is presumed correct. Petitioners must prove by a preponderance of the evidence that respondent erred in his determination. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). At trial, the parties offered the testimony of experts to assist the Court in its determination of the fair market value of the timeshares in issue at the time they were purchased by petitioners. Petitioners first offered Francis Longstaff as an expert in financial analysis. Mr. Longstaff authored the JPS reports that were included in the timeshares' sales material made available to petitioners by Kilburn. As we have noted, supra, the Court ruled that Mr. Longstaff did not *130 qualify as an expert. Because the JPS reports were included in the Kilburn timeshare sales materials and were reviewed by petitioners before they purchased their timeshares, the Court admitted the reports into evidence and permitted Mr. Longstaff to testify as a fact witness. Although the JPS reports, authored by Mr. Longstaff, were not received in evidence as expert reports, we will address ourselves to the contents of those reports since petitioners reviewed them prior to purchasing their Kilburn timeshares. As we have noted, supra, the JPS reports, prepared by Mr. Longstaff on April 8, 1981, and June 23, 1981, assumed an inflation rate of nine percent per year for the succeeding 25 years. The reports state that a Kilburn investor would receive a return of 13.34 percent under a low-growth scenario and 17.38 percent under a medium-growth scenario. This return appears to be the internal rate of return per year an investor would receive on his investment (the down payment) after the appreciated property is used to make the balloon payment. To explain why JPS's projected inflation rate is vastly overstated we first need explore what inflation is. Inflation is defined as *131 a change in the consumer price index over a period of time, normally one year. The consumer price index is a measure of the cost of a variety of goods compiled by the Bureau of Labor Statistics of the Department of Labor. Annual inflation compounded yearly for the 30 years prior to 1981 was 4.4 percent. Annual inflation compounded yearly for the period 1945-1950 was 5.8 percent, one of the highest historical periods of inflation. However, for the 30 years following 1945 the annual inflation rate compounded annually was only 3.7 percent. Annual inflation compounded yearly for the period 1971-81 was 8.1 percent, also a very high rate of inflation. Housing prices are a component of the consumer price index. The housing component of the consumer price index generally moves in the same direction as the index, although in a leading fashion. There is no indication in the record that over the long run, inflation in the Park City area was or would be unlike the national rate of inflation. The conclusions in the report are flawed in two important respects. First, the predicted annual inflation rate of nine percent is wholly unrealistic and is not supported by any historical rate *132 of inflation. Second, the report does not set forth any valid support for the proposition that the timeshares will appreciate over 30 percent per year for 25 years. Kilburn hired Clyde E. Williams to appraise various of the Kilburn properties as of certain dates in 1980 and 1981. Mr. Williams is a senior real property appraiser with the Society of Real Estate Appraisers (SREA). Williams' appraisal reports were introduced into evidence at trial and Mr. Williams was called by petitioners as an expert witness to testify as to his appraisals. Mr. Williams' valuation methodology was the same in each of his 11 appraisals. We will address ourselves to his appraisal of that particular Kilburn property identified as Lot 160, Prospector Park, Park City, Utah. In his report under "Purpose of the Appraisal," Mr. Williams noted that the property rights he was appraising were unencumbered fee simple interests. The record shows that petitioners Henry B. Ames and Dortha S. Ames, on December 30, 1980, purchased one timeshare unit in the property identified as Lot 160, Prospector Park. In the real estate contract executed by the Ames, it was specifically stated: that there presently exist *133 obligations against said property as follows: Approximate
Payable to
Balance
Balance as of
Gate City Mortgage
$ 124,000
3/5/80  Misat Corporation
26,000   12/30/80
Kilburn Vacation
Timeshare  500,000  12/30/80
Nowhere in any of his appraisal reports does Mr. Williams acknowledge that the underlying properties that he valued, to arrive at the market value of one timeshare unit, were subject to prior obligations nor does he make any adjustments in his timeshare market valuations to reflect those obligations. In his report under "The Appraisal Process," Mr. Williams notes that the three basic approaches used by appraisers are the cost approach, the market approach, and the income approach. He states: The income approach as used for investment properties has as its premise the estimation of the amount of the net income, which when capitalized in a manner that is commensurate with the risk and the life expectancy of the improvements will indicate the present value of the income stream. The value estimate is obtained by estimating fair economic rent which the subject property might produce based on the rent return of competitive properties. *134 Then deducting vacancy losses and expenses and capitalizing the resulting net income by an appropriate capitalization rate. After arriving at an indication of value by each of the three approaches, the factors of each are carefully weighed. The indications of value derived from each of the approaches are correlated into a single conclusion of value, based on the approach that is the strongest and most typical of the market. However, because of the uniqueness of this report, only the cost approach and the market approach will be used. [Emphasis added.] Mr. Williams then noted that after a base value had been established for a timeshare unit, that base value was multiplied by a value ratio developed from an analysis of comparable timeshare sales. Mr. Williams arrived at his value ratio and the market value of each timeshare unit as follows: VALUE RATIO ANALYSIS
To find a ratio for value three condominium projects that were sold on weekly time shares were used. The normal market value of the property was divided into the total time share sale price to develop a value ratio. Sale No. 1
Sweetwater Project at Park City: The high sale price was $ 8,000 *135 per week and the low was $ 6,500 per week for an average of $ 7,250 per week time share. However, the properties can trade time with other time share properties, this is considered to be worth 10% of the value. Average sale price per unit
$ 7,250
Multiply by no. of shares  52
Total sale price (all shares
$ 377,000
Divided by normal market value  76,000
Value ratio
4.96
Less trade consideration at 10%  .50
Adjusted Value Ratio
4.46
Sale No. 2
Snowbird Project: The high sale price per one week time share is $ 12,000, and the low is $ 6,000 per time share for an average sale price of $ 9,000 per time share. Average sale per unit
$ 9,000
Multiply by no. of shares 52
Total sale price
$ 468,000
Divided by normal market value 105,000
Value ratio
4.46
Sale No. 3
Sweetwater Project in Hawaii: This property was purchased for $ 108,000 and was sold for $ 10,000 per time share for one week. Has trade amenity. Sale Price per unit
$ 10,000
Multiply by no. of shares 52
Total sale price
$ 520,000
Divided by normal market value 108,000
Value ratio
4.81
Less trade consideration at 10% .48
Adjusted Value Ratio
4.46 (sic)
*136 Sale No. 1 is the indicated best comparable sale because of location, and there is good support from Sale No. 2. Indicated Value Ratio:
One week time share ratio
4.46
Plus week to day ratio
7 days/   52 weeks X 4.46 =   0.60
Indicated Value Ratio:
5.06
Indicated Time Share Value:
Normal estimated value of house
$ 200,000
Divided by 365 (days) 365
Each share   $ 547.95
Value ratio (multiplied)   5.06
Estimated value per time share
$ 2,773
Rounded
$ 2,775
RECONCILIATION AND FINAL ESTIMATE OF VALUE
After considering the Cost Approach and the Market Approach to Value, it was estimated that the normal market value of the subject property was $ 200,000. The Value Ratio was estimated to be 5.06, which was then applied to the subject to estimate a market value for each time share. It shluld (sic) be noted that there are only 350 time shares in the subject. However, to make a fare (sic) analysis, with consideration to the comparable sales, 365 was used. Subject to the certification and limiting conditions contained in this report, it is my opinion that *137 the reasonable market value of each subject time share, as of the 23 day of December, 1980 is: TWO THOUSAND SEVEN HUNDRED SEVENTY-FIVE DOLLARS ($ 2,775) Mr. Williams' determination of value ratio, in our opinion, is flawed in at least two respects. There is no evidence in this record that all of the weekly timeshare units (52) in the comparables used by Mr. Williams were sold. Mr. Williams made no inquiry as to vacancy rates in his comparables and that, in our opinion, is a telling omission. If, for example, the vacancy rate in Mr. Williams' Sale No. 1 comparable, supra, was only 20 percent, his value ratio would be 3.47. His market value per timeshare unit, therefore, would be $ 1,952 (7,250 X 41.6 = 301,600 divided by 76,000 = 3.97 - .40 = 3.57 X $ 547.95 = $ 1,956 or $ 1,952). Mr. Williams also assumed that a one-day timeshare was proportionately more valuable than a one-week timeshare. We do not accept that assumption as likely; common sense would indicate that the opposite is true. Petitioners have made it abundantly clear both at trial and in their briefs that they purchased Kilburn timeshare units for investment purposes, i.e., to rent and for appreciation. Mr. *138 Williams, however, arbitrarily ignored the income approach to valuation. Although he had no qualms about using condominiums in his market approach, he would not use the rental of condominiums in an income valuation because "they are a different kind of property." We find that Mr. Williams' appraisal reports are of little assistance to us in determining the value of the Kilburn properties to the petitioners in these cases who purchased the Kilburn timeshare units for investment. Market value can be called "the value of the marketplace"; investment value is the specific value of goods or services to a particular investor (or class of investors) for individual investment reasons. Market value and investment value are different concepts, although the values estimated for each may or may not be numerically equal depending on the circumstances. In addition, market value estimates are commonly made without reference to investment value, but investment value estimates are frequently accompanied by a market value estimate to facilitate decision making. [American Institute of Real Estate Appraisers, Appraisal of Real Estate, p. 596 (9th ed. 1987).] Consequently, we do not accept *139 Mr. Williams' valuations of the various Kilburn timeshare units appraised by him. Petitioners called as an expert witness Kathleen Conroy, president of Resort and Urban Property Appraisers, a real estate appraisal and consulting firm with offices in Tampa and Coral Gables, Florida. Ms. Conroy is a member of the American Institute of Real Estate Appraisers, and is a member of the Society of Real Estate Appraisers, SRPA. She is the author of a book entitled Valuing the Timeshare Property which was published by the American Institute of Real Estate Appraisers in 1981. James Clark, president of Kilburn Vacation Homeshares, hired Ms. Conroy to determine the market value of a timeshare unit of Kilburn properties identified as Lot No. 98 and Lot No. 72 in the Prospector Park Subdivision, as of January 1, 1982. At trial, petitioners introduced into evidence the reports prepared by Ms. Conroy to value the Kilburn properties identified as Lot 98 and Lot 72, Prospector Park Subdivision. Both reports used the same methodology of valuation. We will, therefore, address ourselves only to the report valuing Lot 98. The effective date of the appraisal was January 1, 1982. Ms. Conroy's *140 method of appraisal was to utilize a rental survey of comparable resort accommodations in the Park City marketplace. The rental rates of the comparable accommodations included in the survey were then compared and analyzed in relation to the property being valued (Lot 98). From Ms. Conroy's comparative analysis, an estimate was then made as to the weighted average weekly economic rental of Lot 98; that figure was then translated into an estimate of the market value of one timeshare unit. The comparables used in the rental survey included both houses and condominiums located in the Park City marketplace. Based upon the results of the survey, Ms. Conroy was of the opinion that the winter economic rental for Lot 98 would be $ 210 per night during the regular season and $ 235 per night during the Holiday season (Christmas-New Year). Discussions with Park City rental brokers and property managers indicated that the economic rental for Lot 98 during the summer season would be $ 600 a month. The weighted average weekly economic rental for Lot 98 was determined as follows: Regular Season
$ 210/night X 7 days X 18 wks
=
$ 26,460
(18 Weeks)  Holiday Season
$ 235/night X 7 days X 2 wks
=
$ 3,290 (2 Weeks)  Summer Season
$ 600/month X 8 months
=
$ 4,800 (32 Weeks or 8 Months)   Total Potential Annual Rental Revenue
$ 34,550
$ 34,550 divided by 52 weeks     =
$ 664.42
Weighted Average Weekly Economic Rental
=
$ 665.00
*141 The weighted average weekly economic rental ($ 665) was then translated into the market value of a timeshare unit in Lot 98 based on the following timeshare pricing method: The market value (price) established for a one week fee timeshare is based upon an assumed 15 year payback period (or break even point) with the total money that would be expended for the annual weekly rental of a comparable vacation accommodation, assuming an average increase in resort rental rates of 10% per year. The market value of a timeshare unit in Lot 98 was valued as of January 1, 1982, as follows: Year
Lot 98
Base Year
1982
$ 665   1983
731
1984
804
1985
884
1986
972
1987
1,069
1988
1,175
1989
1,292
1990
1,421
1991
1,563
1992
1,719
1993
1,890
1994
2,079
1995
2,286
1996
2,514
Market Value of One Week Timeshare $ 21,064
Market Value of One Timeshare Unit
(One Unit = One Day)  $ 3,010 At page two of her book titled Valuing the Timeshare Property, hereinafter referred to as "the book," Ms. Conroy wrote: Timesharing is frequently described as purchasing tomorrow's vacation at today's prices. Today, *142 with more leisure time available to individuals and the growing interest in recreational activity within American society, coupled with rising hotel rates (10% to 20% per year), the concept of timesharing has proven to be not only economically viable but a practical hedge against inflation. When asked the question at trial: "What are the advantages of timesharing?" Ms. Conroy answered, "They are able to hedge against rising resort rental rates by essentially buying today's vacation or tomorrow's vacation, rather, today." At page 4 of her book, Ms. Conroy wrote "the purchase cost of the timeshare unit should not exceed 10 times the weekly cost of renting a comparable unit in terms of season, location, and physical and recreational amenities." In determining the market value of one timeshare unit in Lot 98, however, Ms. Conroy, in her Weighted Average Weekly Economic Rental Table, supra, first increased the weekly economic rental by a 10-percent inflation rate compounded annually. She next used a 15-year payback period. When Ms. Conroy was reminded that her weekly rental table, supra, was inconsistent with her description of timesharing in her book as "purchasing tomorrow's *143 vacation at today's prices," she responded, "I don't agree with that as it is written." She later described the statement as a technical misnomer. When she was reminded that, in her book, Ms. Conroy had written "the purchase cost of the timeshare unit should not exceed 10 times the weekly cost of renting a comparable unit in terms of season, location, and physical and recreational amenities," Ms. Conroy responded that things had changed since she wrote her book. We would note that things must have changed rather rapidly. Ms. Conroy's book was published in 1981. Her reports valuing the subject timeshares were forwarded to Mr. Clark by letters dated March 23, 1982. Chapter 7 of Ms. Conroy's book is titled Timeshare Valuation. In discussing the establishment of seasonal timeshare prices, Ms. Conroy states: ESTABLISHING SEASONAL TIMESHARE PRICES One of the initial tasks to be undertaken when performing an appraisal of a timeshare project is the establishment of a seasonal pricing schedule for the various timeshares to be sold. In establishing a pricing schedule, the following primary market research and analyses must be performed. First, the location and socio-economic profile *144 of the market segments qualified for timeshare ownership must be isolated, identified, and quantified. The proper collection and analysis of this data requires a specialized knowledge of, and expertise in, primary market research techniques, the scope of which is beyond the purpose of this monograph. Appraisers lacking experience in this type of data collection should seek outside assistance. Second, the demand for and seasonal pricing of comparable vacation rental units within the area of the subject property must be identified. This analysis normally will include any or all of the following property taxes: 1. Comparable timeshare units. 2. Comparable condominium rental units. 3. Vacation houses available for rental. 4. Comparable hotel-motel unit rentals. The demand for and corresponding vacancy ratio experienced by comparable properties is an important factor to be analyzed. For example, if there is an overall abundance of comparably located and equipped condominium units, available for weekly rentals on a year-round basis at market competitive prices, there may be little demand for timeshare units. Timeshare purchasers may be few if there are as comparable *145 and readily convenient rental vacation units available. Therefore, it is important for an appraiser to consider the overall supply and demand patterns evidenced by vacation rental units in the marketplace relative to the subject timeshare units. [Emphasis added.] When questioned at trial about her valuation methodology as she applied it to her valuations in this case, Ms. Conroy was asked, "Did you take into consideration any vacancies?" to which she responded, "Vacancies are not a factor in the rental payback method." As we have noted, supra, in valuing timeshares for Mr. Clark, Ms. Conroy first determined the weighted average weekly economic rental of a timeshare unit ($ 665). She then applied a 10-percent inflation rate, compounded annually for a period of 15 years, to arrive at the market value of a one-week timeshare ($ 21,064). At trial, Ms. Conroy was asked whether the time value of money was a factor in her valuation methodology: Q In calculating what that particular unit is worth, there is no -- it is your testimony that you do not take into account the time value of money. Is that correct? A What a timeshare unit is worth? No. You look at rental rates *146 as we have just discussed. Q For example, if you will look at your -- what has been stipulated into evidence -- excuse me -- accepted into evidence as Exhibit 269, it is your appraisal of Lot 98 in Prospector Park subdivision, and the base year in that calculation was the year 1982. You stated in that calculation that rental rate -- the weekly rentals for a comparable unit in 1982 would be $ 665. Is that correct? A That is correct. Q And the amount of rental for that same unit in 1996, 15 years down the road, would be $ 2,514. Is that correct? A That is correct. Q And so in order to purchase the vacation in 1996 at $ 2,514, you will be paying $ 2,514 for it in the year 1982. Is that correct, under your methodology? A I am just trying to understand your question. The question was that if you are going to pay $ 2,514 for a vacation in 1996, then you are paying essentially that money today with this method. Q That is exactly my question. A That is correct. Ms. Conroy also testified that, although a homeshare owner would incur expenses incident to the ownership of a timeshare unit, expenses are not a factor. Ms. Conroy also testified that the rental payback method *147 of valuation used by her in valuing timeshare units for Mr. Clark inherently presumes personal usage. Ms. Conroy was given the sales brochure that Kilburn had distributed to potential timeshare purchasers when she was hired by Mr. Clark to value the Kilburn timeshares. The sales brochure contained the following introductory language: The following is not meant as legal, accounting, investment or tax advice. Each prospective purchaser should consult his own advisor for such counsel. Kilburn Vacation-Homeshare, Inc. provides no guarantees or warranties whatsoever, expressed or implied, regarding the actual result of a purchase. The success of such an investment is dependent on the purchaser since each purchaser must be prepared to provide his own business management including but not limited to rental, accounting, sales or other services. The following discussion centers around one method of purchase of a Kilburn Vacation-Homeshare -- the use of Seller financing with specified terms and conditions. Other options are available to a purchaser: (1) an all cash purchase and (2) negotiated terms and conditions. All sections in this brochure should be disregarded, except "Time Share", *148 "Park City" and "Rental Property", if an alternative option is taken. If the purchase is to be for personal use, the section "Rental Property" should also be disregarded. Persons interested in other purchase or use options should contact the Seller for further information. Thus, it can be seen that Kilburn primarily sought to sell its timeshares to a market that would use them for rental purposes. Ms. Conroy, however, did not address herself to the purchase of timeshares for investment, i.e., rental purposes. Having read Ms. Conroy's book, Valuing the Timeshare Property, and her valuation reports that were introduced into evidence at trial and after observing her on the witness stand at trial, we are of the opinion that Ms. Conroy's valuations are more in the nature of targeted figures, rather than the determination of market values predicated on an independent and unbiased analysis. We are singularly unpersuaded by the valuation methodology used by Ms. Conroy to value the Kilburn timeshares and we do not accept the timeshare market values determined by her in this case. Mr. Michael Greene was called as an expert witness by respondent. He is a member of the American Institute *149 of Real Estate Appraisers, MAI and is a senior member of the National Association of Review Appraisers, C.R.A. Mr. Greene valued the timeshares purchased by petitioners Forever Living Products, Hildebrand, Waltuck, Lukens, Ames, Waren, and Chesser. Mr. Greene's appraisal report was introduced into evidence at trial. The following is that part of Mr. Greene's Appraisal Report entitled "Appraisal Process": APPRAISAL PROCESS
In valuing these taxpayers (sic) timeshare intervals, the appraisers have utilized three different methods The first approach involves the use of comparable timeshare interval sales in the Park City area. In comparing these properties to the subject properties we are able to ascertain a value for the three bedroom units as well as the value of an additional bedroom. From this information we are able to arrive at a value for the one-week timeshare interval on a rotating basis. The second method of valuation utilized involves deriving an average annual rental rate, per one-week interval, for each of the seven comparables. Dividing the average annual sales price per one-week interval by the average annual rental rate per one-week interval, for each unit *150 of the comparables, gives a Gross Rent Multiplier. Applying the Gross Rent Multiplier to the average annual rental rate, per one-week interval, of the comparable house rentals gives a value for the one-week timeshare interval on a rotating basis, via a Gross Rent Multiplier. The third method of valuation utilized involves deriving an overall rate from the comparable timeshares. We arrive at this rate by subtracting the maintenance fee and 25% rental fee from the average annual rental amount. Dividing this net income by the average annual sales price per interval gives the overall rate. Dividing the Average Annual Rental Income per Interval for the Park City House Rental Comparables by this overall rate gives a value for the one-week timeshare interval on a rotating basis via an overall rate. The subject timeshare intervals are based on a variable time schedule. This master schedule is located in the addenda of this report. The fact that the intervals rotate throughout the year necessitates the use of average annual sales prices per interval and average annual rental income per interval to arrive at a value for the subject intervals. Furthermore the subject intervals are sold *151 on the basis of a single day, therefore, the analysis used in arriving at a Fair Market Value for the subject necessitates dividing our value conclusion by seven to arrive at a final conclusion of Fair Market Value. Mr. Greene first valued petitioners' timeshares as of January 2, 1986. To arrive at a value for the timeshares as of the dates of purchase in 1980 and 1981, Mr. Greene adjusted his January 2, 1986, valuation by utilizing the increase in the Consumer Price Index, hereinafter CPI, from the dates of purchase in 1980 or 1981 through 1985. Because there was no published CPI for the Salt Lake City areas, Mr. Greene used the CPI for the Denver, Colorado, area, e.g., the CPI in Denver in 1981 was 277.3 and in 1985, it was 358. The calculation he used to arrive at the percentage change in the CPI was: 358.00
- 277.37
80.63/
80.63
277.3
X
100
=
29.08%
Mr. Greene then multiplied the market value determined as of January 2, 1986, by .71 to arrive at the purchase date market value. Events occurring after the valuation date generally may not be considered in determining the value of property on a given date. In general, *152 property is valued as of the valuation date on the basis of market conditions and facts available on that date without regard to hindsight. However, we have held that postmortem events can be considered by the Court for the "limited purpose" of establishing what the willing buyer and seller's expectations were on the valuation date and whether these expectations were "reasonable and intelligent." Estate of Jephson v. Commissioner, 81 T.C. 999 (1983). The rule that has developed, and which we accept, is that subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation. See, e.g., Ithaca Trust Co. v. United States, 279 U.S. 151 (1929); Estate of Van Horne v. Commissioner, 720 F.2d 1114, 1116 (9th Cir. 1983), affg. 78 T.C. 728 (1982), cert. denied 466 U.S. 980 (1984); Guggenheim v. Helvering, 117 F.2d 469 (2d Cir. 1941), cert. denied 314 U.S. 621 (1941); Couzens v. Commissioner, 11 B.T.A. 1040, 1165 (1928). * * * [Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987). *153 Fn. ref. omitted.] In Couzens v. Commissioner, supra, we said at 1165: Serious objection was urged by respondent to the admission in evidence of data as to events which occurred after March 1, 1913. It was urged that such facts were necessarily unknown on that date and hence could not be considered. It was apparent that there was a fear that the Board would in reaching its judgment be influenced toward a higher value if it were permitted to see the evidence of increasing value after the date in question. The evidence was nevertheless admitted. It is true that value on March 1, 1913, is not to be judged by subsequent events. There is, however, substantial importance in the reasonable expectations entertained on that date. Subsequent events may serve to establish both that the expectations were entertained and also that such expectations were reasonable and intelligent. Our consideration of them has been confined to this purpose. Such subsequent events as have no reasonable relation to the considerations of the date in question have been disregarded. We have not, by looking at the subsequent events now known, found what the value would have been had they *154 been definitely known on March 1, 1913. The only facts upon which our judgment of value has been predicated are those reasonably known on that date. These included not only those which had completely occurred, but also those which were in process and those which were reasonably in contemplation. We find it to be incredible that respondent would introduce into evidence a report ostensibly valuing properties in the Park City, Utah, area as of various dates in 1980 and 1981, when the properties were actually valued as of January 2, 1986, and those valuations were then adjusted back to 1980 and 1981 by utilizing the difference in the Denver, Colorado, CPI between 1981 and 1985. We have no alternative but to reject Mr. Greene's 1980 and 1981 valuations of petitioners' properties. All too frequently in valuation cases, the Court is called upon to do what the parties cannot or will not do. If the parties fail to provide the Court with competent evidence to value assets, we will not avoid our responsibilities -- we will value the assets ourselves. Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441 (1980). We are not constrained to accept experts' opinions *155 which are contrary to our own judgment. Estate of Kreis v. Commissioner, 227 F.2d 753 (6th Cir. 1955), affg. a Memorandum Opinion of this Court. We may either accept or reject expert testimony in accordance with our own judgment, Helvering v. National Grocery Co., 304 U.S. 282 (1938), and we may be selective in determining what portions of an expert's opinion, if any, we will accept. Parker v. Commissioner, 86 T.C. 547, 562 (1986). Kilburn timeshares were packaged and sold primarily as investment properties as evidenced by the sales brochure distributed to petitioners by Kilburn. Those petitioners who testified at trial also testified that they purchased their Kilburn timeshares for investment purposes. We will, therefore, value the Kilburn timeshares predicated on the fact that they were offered as, and purchased as, investment property. Mr. Greene, respondent's expert at trial, testified that he used the income approach in valuing the properties in issue to corroborate his valuations of the properties in issue. He testified that the income approach was not a usual method used in the valuation of timeshares because timeshares *156 were not considered to be income-producing properties. We have found, supra, that the Kilburn timeshares were offered for sale as income-producing properties. Mr. Greene primarily relied upon the cost and market value approaches to the valuation of the properties in issue. He testified, however, that he had all the data available to him to value the properties on the income approach. He further testified that he was familiar with Ms. Conroy's book entitled Valuing the Timeshare Property and that it was an excellent book, containing generally accepted methods for valuing timeshare property. In employing the income approach to the properties in issue, Mr. Greene correctly decided that, in determining his timeshare values, he should take into consideration expenses, maintenance fees, and real estate commissions. We agree with Mr. Greene that the book, Valuing the Timeshare Property, is an appropriate touchstone for the valuations of the properties in these cases. In her appraisal of Lot 98, Prospector Park Subdivision, Park City, Utah, Ms. Conroy conducted a rental survey of comparable resort accommodations in the Park City area, comprised of single family houses and condominiums *157 in order to arrive at her valuations of a Kilburn timeshare unit. We accept Ms. Conroy's comparables for the purpose of valuing, in Lot 98, as of January 1, 1982, a one-unit, one-day Kilburn timeshare unit. Ms. Conroy's valuation summary is as follows: WEIGHTED AVERAGE WEEKLY ECONOMIC RENTAL
YEAR
LOT 98
(Base Year)
1982
$ 665   1983
731
1984
804
1985
884
1986
972
1987
1,069
1988
1,175
1989
1,292
1990
1,421
1991
1,563
1992
1,719
1993
1,890
1994
2,079
1995
2,286
1996
2,514
Market Value of One Week Timeshare $ 21,064
Market Value of One Timeshare Unit $ 3,010 (One unit = one day)
In conclusion, our analysis indicates that the market value of a timeshare unit in Lot 98, Prospector Park Subdivision, Park City, Utah, is $ 3,010. To arrive at the preceding summary, Ms. Conroy states: The market value (price) established for a one-week fee timeshare is based upon an assumed 15 year payback period (or break even point) with the total money that would be expended for the annual weekly rental of a comparable vacation accommodation, assuming an average increase in resort rental rates *158 of 10% per year. We disagree with Ms. Conroy's foregoing comments. In order to determine the value of a one-week fee timeshare, we will assume a 10-year payback period and we will not assume an average increase in resort rental rates of 10 percent per year. We assume the 10-year payback period in accordance with the statement at page 4, Valuing the Timeshare Property, which says: the purchase cost of the timeshare unit should not exceed 10 times the weekly cost of renting a comparable unit in terms of season, location, and physical and recreational amenities. We will also accept the observation noted at page 4 of Valuing the Timeshare Property that: the timeshare buyer is able to purchase future vacations with today's dollars. This, in turn results in a hedge against inflation and a substantial savings over time for the buyer. At trial, Ms. Conroy divorced herself from the above-quoted proposition and insisted that inflation should be taken into account in valuing timeshares. Even if we were to accept Ms. Conroy's departure from her text, we would discount one dollar to be paid in the future to represent its present value. This has the result of cancelling out the effects *159 of inflation on value. Indeed if the discount factor exceeded the rate of inflation the overall result would be to reduce value below that amount determined without regard to either factor. We have reviewed D. Thorndike, Thorndike Encyclopedia of Banking & Financial Tables (1980 rev.), in which the determination of the present worth of one dollar to be paid in the future is mathematically computed in accordance with the formula: V = 1 / (1 + I)<n>, where V is the present value of one dollar to be paid in the future, the numerator is one, and the denominator is one plus the annual interest rate raised to the number of payback years. Applying the Thorndyke formula to Ms. Conroy's yearly rental rates results in a weighted average weekly economic rental of approximately $ 665 per year for Lot 98. We will then divide this weekly rental by seven to arrive at an average daily rental of $ 95. Then, using Ms. Conroy's ten-year payback method we arrive at a value of $ 950 ($ 95/yr. X 10 yrs.). This conclusion is corroborated by Mr. Greene's method, which was to multiply the gross rent received by a gross rent multiplier of ten. Mr. Greene's method similarly results in a value of $ 950 *160 per unit. The drawback of both the ten-year payback method and the gross rent multiplier is that they do not take into account out-of-pocket expenses incurred by the timeshare owners. The two most obvious out-of-pocket expenses are the annual maintenance fee of $ 35 per unit and the rental fee charged by the rental agents of approximately 25 percent of the rent received. Taking these two expenses into account, the net income received by the timeshare owners in our example on a per unit basis would be $ 36.25 [($ 95 X .75) - $ 35 = $ 36.25]. Unfortunately, none of the experts gave us a capitalization rate that, when applied to net income, would give us a value of the timeshare units. Mr. Greene did give us an "overall rate" that he divided by his determination of net income to arrive at a value. However, he did not explain how he arrived at his overall rate, so we are disinclined to use it. Furthermore, we have been conservative in favor of petitioners because we have not taken into account either a vacancy rate or the fact that the maintenance fee will increase geometrically as the properties age and deteriorate over time. Suffice it to say that the investment in the timeshare *161 unit would produce very little income over time after expenses are taken into account. Using the same methodology as above, we find the weighted average daily economic rental, the fair market value using the ten-year payback method, and the net income to be as follows: Valuation
Gross
Net
Property & House No.
Date
Rent
Value
Rent
Lot 72 Pros. Park (31)
1/1/82
$ 100.71
$ 1,007.10
$ 40.53
Lot 87 Pros. Park (9)
9/8/81
91.71
917.10
33.78
Lot 147 Pros. Park (11)
2/27/81
100.40
1,004.00
40.30
Lot 122 Jer. Rch. (12)
10/19/81
84.73
847.30
28.54
Lot 43 Sil. Spr. (3)
12/17/80
77.17
771.70
22.88
Lot 98 Pros. Park (4)
1/1/81
86.11
861.10
29.58
Lot 82 Jer. Rch. (35)
12/29/81
87.12
871.20
30.34
Lot 1036 Jer. Rch. 28)
12/29/81
87.12
871.20
30.34
Lot 65 Jer. Rch. (36)
12/29/81
91.90
919.00
33.93
Lot 130 Jer. Rch. (20)
12/29/81
91.90
919.00
33.93
Lot 1033 Jer. Rch. (30)
12/29/81
91.90
919.00
33.93
Lot 54 Jer. Rch. (38)
12/29/81
91.90
919.00
33.93
Lot 160 Pros. Park (6)
12/30/80
79.18
791.80
24.39
The next issue for decision is whether petitioners are entitled to deductions for accrued interest expenses *162 incurred by them in purchasing Kilburn timeshare units. Section 163 (a) provides for the deduction of "all interest paid or accrued within the taxable year on indebtedness." It is well settled that in order for the deduction to be allowed, the indebtedness must be genuine -- the taxpayer must actually have paid or incurred an obligation for the use or forbearance of money. Knetsch v. United States,364 U.S. 361 (1960); Norton v. Commissioner,474 F.2d 608 (9th Cir. 1973), affg. a Memorandum Opinion of this Court; Narver v. Commissioner,75 T.C. 53 (1980) affd. without published opinion 670 F.2d 855 (9th Cir. 1982). It is also well established that a nonrecourse loan, where a mortgagor incurs an obligation to repay and the mortgage will be repaid, is a true loan, the amount of which must be included in determining the basis of the property purchased. Crane v. Commissioner,331 U.S. 1 (1947). However, if the purchase price of an asset purchased with nonrecourse debt greatly exceeds the value of that asset, the nonrecourse debt is not bona fide and will not be recognized for tax purposes because the *163 purchaser is not making a capital investment in the unpaid portion of the purchase price. Estate of Franklin v. Commissioner,544 F.2d 1045, 1048-1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975). In other words, if the nonrecourse debt greatly exceeds the fair market value of the asset at the time of purchase, there is no economic incentive to pay off the debt because the purchaser will never obtain any equity in the property. Odend'hal v. Commissioner,748 F.2d 908, 912-913 (4th Cir. 1984), cert. denied 471 U.S. 1143 (1985), affg. and remanding 80 T.C. 588 (1983). The Estate of Franklin analysis only applies to nonrecourse indebtedness. In the case of recourse debt there is an economic incentive to pay off the unpaid purchase price because the mortgagor is personally liable on the indebtedness. He cannot, in effect, just walk away from it. See Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 95-96 (4th Cir. 1985), affg. in part, revg. in part 81 T.C. 184 (1983). There is another line of cases, in many ways complementary to Odend'hal and Estate of Franklin, *164 which hold that highly contingent or speculative obligations, even if they are recourse, are not recognized for Federal tax purposes. Fox v. Commissioner,80 T.C. 972, 1020-1021 (1983), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), citing among other cases CRC Corp. v. Commissioner,693 F.2d 281 (3d Cir. 1982), revg. and remanding on other grounds sub nom. Brountas v. Commissioner,73 T.C. 491 (1979), cert. denied 462 U.S. 1106 (1983); see also section 1.461-1(a)(2), Income Tax Regs.
We have previously found that the fair market value of the Kilburn timeshares purchased by petitioners in these cases is substantially less than the units' stated purchase prices. We have also previously found that the interest on the debt accrues yearly and is "added on" to the unpaid purchase price. Thus, if a purchaser wants to pay off his debt he must pay both the accrued interest and unpaid purchase price. In addition, the interest accrual is front-loaded, meaning that the interest accruals in the early years are much larger than the accruals in the later years. Because of this front-loading *165 feature the payoff amount will be much larger than the fair market value of the timeshares at the time of payoff even under the most optimistic appreciation rates. For example, petitioner FLP purchased 700 timeshare units in 1981 for a total purchase price of $ 2,205,000. We have previously found that the fair market value of these same 700 units was $ 637,700 ($ 911 average fair market value per unit X 700 units). If FLP wanted to pay off its debt early it would have to pay, for instance, $ 8,328,268.82 in accrued interest and principal at the close of 1982, $ 11,282,870.97 at the close of 1983, $ 14,119,451.61 at the close of 1984 and $ 30,670,913.98 at the close of 1991. It is obvious that these payoff amounts greatly exceed the purchase price of the property. It is also quite obvious that the payoff amounts are so much greater than the initial fair market value that it would be ludicrous for petitioner FLP to pay off $ 8,328,268.82 nonrecourse debt on property originally worth $ 643,300 in 1982, for example. These realities remain true even if the timeshares appreciate substantially in value. These realities must be seen in conjunction with the fact that we have found the *166 appreciation of the timeshares to be much less than that predicted by Kilburn. If FLP sold these timeshares in 1982, the amount received would be much less than the payoff amount. This disparity between fair market value and the payoff amount would continue throughout the life of the loan. Petitioners would never have any equity in the property; in fact, they would always have a negative equity because the payoff amount would always exceed the fair market value of the property. Therefore, since the fair market value of the timeshare units would never approach the year-end payoff amount and since this fact was obvious from the inception of the loan, we hold that petitioners have not made a bona fide investment in the property. Accordingly, the nonrecourse debt is without economic substance and will not be respected for Federal tax purposes. This has the effect of disallowing the interest deductions incurred on account of the debt. Estate of Franklin v. Commissioner, supra.
We next turn to whether petitioner FLP is entitled to the depreciation deductions it claimed with respect to its investment in the Kilburn timeshares. [7]
*167 Having found that the nonrecourse indebtedness is not genuine, petitioners, including FLP, may not include it in their tax basis of the timeshares. Estate of Franklin v. Commissioner, supra at 1049. Accordingly, the depreciation deductions attributable to the disregarded portion of the basis is disallowed. See Rice's Toyota World, Inc. v. Commissioner, supra at 95. The remaining deductions in issue in these cases are the balance of FLP's depreciation (that amount taken with respect to the cash down payment) and all of petitioners' "other deductions" which are incidental expenses associated with the timeshares such as the owners' association annual fee, the rental agent's fee, etc. Petitioners may deduct these expenses only if they are ordinary and necessary and are incurred in connection with a trade or business or in connection with the production of income. The answer to the threshold question in deciding whether this requirement is met is a showing that the activity in question was entered into with an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion *168 702 F.2d 1205 (D.C. Cir. 1983). Although a reasonable expectation of profit is not required, the activity must be entered into, in good faith, with the objective of making a profit. Taube v. Commissioner,88 T.C. 464, 478-479 (1987). Greater weight is given to objective facts than to the parties' mere statements of intent. Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Profit objective is determined at the partnership level. Flowers v. Commissioner,80 T.C. 914, 932 (1983). In the absence of a profit objective, individuals and subchapter "S" corporations may generally deduct expenses to the extent of income from the activity. Section 183(b); section 1.183-1(b)(1)(ii), Income Tax Regs. Section 183, however, does not apply to "C" corporations. All individual petitioners testified that they invested in the timeshares to make a profit. However, after examining the objective facts, we find that the individual petitioners did not have a profit objective, independent of tax savings. Rent received from the timeshares was negligible. Vacancies were abundant. Even the promotional materials stated that profit would *169 come from appreciation, not income. However, as for the all important promised appreciation, we have previously found that the fair market value of the timeshares would never equal or exceed the payoff amount of the debt. For that reason petitioners could never sell the timeshares and realize a profit. In fact, in all likelihood petitioners would forfeit their interests in the property rather than pay a nonrecourse debt that greatly exceeded the value of the timeshares. The motivating factor in these cases was the extravagant tax write-off petitioners received as compared to their cash outlay. Without the tax write-offs, petitioners would have received no benefit from the purchase of the timeshares. Accordingly, since we have found that petitioners lacked a profit objective with respect to their investments in the Kilburn timeshares, the depreciation (FLP only) and other related expenses incurred by petitioners are not deductible except to the extent of the income generated from the activity. Because we have disallowed petitioners' interest, depreciation, and other expenses, we need not reach the remaining issues raised in these cases, save the additions to tax and increased *170 rate of interest. The next issue presented for decision is whether petitioners in docket Nos. 33910-84, 9035-85, and 17128-85 are liable for an addition to tax for negligence under section 6653(a) and 6653(a)(1), and 6653(a)(2). Section 6653(a) (for 1980) and section 6653(a)(1) (for 1981 and 1982) provide that if any part of any underpayment is due to negligence or intentional disregard of rules and regulations, an amount equal to five percent of the underpayment shall be added to the tax. For purposes of this section "negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner,85 T.C. 934, 937 (1985), citing Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967), cert. denied 389 U.S. 1044 (1968). Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest due on that portion of the underpayment due to negligence or intentional disregard of rules and regulations. In these cases petitioners relied on the promotional materials furnished by Kilburn. The materials included appraisals, appreciation *171 rates, tax advice, and instructions on how to purchase. Petitioners also saw a tax analysis by Coopers and Lybrand in which no conclusions were drawn as to the relevant tax issues. We have found that much of the information contained in the promotional materials was both erroneous and misleading. However, we have also found that petitioners intended to obtain large tax write-offs on nominal cash investments and that they would ultimately walk away from their investments because their timeshares would never be worth more than their (nonrecourse) obligations on them. Under these circumstances, a reasonable and ordinarily prudent person would have sought independent tax advice as to the soundness of the program offered by Kilburn. Petitioners made no effort to substantiate the questionable claims made by Kilburn in its promotional materials. They were clearly negligent within the meaning of sections 6653(a), 6653(a)(1), and 6653(a) (2). The next issue we must decide is whether petitioners in docket Nos. 7613-85 and 17128-85 are liable for the addition to tax for substantial understatements of tax liability under section 6661. Section 6661 provides for an addition to tax if *172 there is a substantial understatement of income tax for any taxable year. Section 6661(a). An understatement of income tax occurs if the tax actually shown on the return is less than the amount which is required to be shown on the return. Section 6661(b)(2). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000 in the case of an individual or $ 10,000 in the case of a corporation. Section 6661(b)(1). However, the amount of the understatement to which this section applies may be reduced where either the position taken on the return was supported by substantial authority or the taxpayer adequately discloses the relevant facts affecting the item on the return. Section 6661(a)(2)(B). But, with respect to tax shelters, the understatement can be reduced only if there is substantial authority and the taxpayer reasonably believes that his position is more likely than not the proper treatment. Section 6661(b)(2)(C). For purposes of this section a tax shelter includes a partnership or other entity whose principal purpose is the avoidance or evasion of Federal income tax. Section 6661(b)(2)(C)(ii). *173 In these cases we have found that petitioners' intent was to secure large tax write-offs on a nominal cash investment. Clearly, with respect to these petitioners, the Kilburn program was a tax shelter. Furthermore, there was no substantial authority that a taxpayer could deduct interest accruals on a nonrecourse debt when the principal amount of the indebtedness will never be paid. Accordingly, petitioners in docket Nos. 7613-85 and 17128-85 will be liable for the addition to tax under section 6661, if the deficiencies computed in those cases are "substantial" pursuant to section 6661(b)(1). The last issue we must decide is whether petitioners are liable for an increased rate of interest under section 6621(c). Petitioners in docket Nos. 9035-85 and 35657-85 have the burden of proof on this issue. However, in docket Nos. 33910-84, 7613-85, and 14162-85 respondent has the burden of proof. Rule 142(a). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" (an underpayment which exceeds $ 1,000) in any taxable year attributed to one or more "tax-motivated transactions." The *174 increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Tax motivated transactions include valuation overstatements and deductions disallowed from activities not engaged in for profit. Section 6621(c)(3); section 301.6621-2T, Q-4 and A-4, Proc. and Admin. Regs. Congress specifically amended section 6621(c)(3)(A), adding to the list of tax-motivated transactions "any sham or fraudulent transaction." Any sham or fraudulent transaction includes transactions that were not entered into for profit and are without economic substance. Patin v. Commissioner,88 T.C. 1086 (1987), affd. without published opinion sub. nom. Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner,864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner,868 F.2d 865 (6th Cir. 1989). The deductions in issue in these cases have been dissallowed because petitioners *175 lacked a profit objective and their nonrecourse notes lacked economic substance. Accordingly, the increased rate of interest under section 6621(c) is applicable. For the foregoing reasons, Decisions will be entered for respondent in docket Nos. 32613-83, 7613-85, 9035-85, 14162-85 and 35657-85.
Decision will be entered under Rule 155 in docket No. 33910-84.
Entry of decision in docket No. 17128-85 will be held in abeyance until there has been a disposition of the severed, non-Kilburn issues.
Footnotes
1. The following cases were consolidated herewith for trial, briefing, and opinion: James Hildebrand and Mary G. Hildebrand, docket No. 33910-84; Marshall H. Waren and Sandra Y. Waren, docket No. 7613-85; Leland Waltuck and Irene Waltuck, docket No. 9035-85; S. Marc Chesser and Angela B. Chesser, docket No. 14162-85; Forever Living Products, Inc., docket No. 17128-85; Howard I. Lukens, docket No. 35657-85.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on any negligent underpayment ** For 1980 the determination was under section 6653(a)↩
3. Under the Rule of 78's, the amount of interest allocable to each payment period over the term of the loan is determined by multiplying the total interest payable by a fraction, the numerator of which is the number of payment periods remaining in the term of the loan at the time of the calculation (including the period for which the calculation is made) and the denominator of which is the sum of the digits of the term of the loan. Ames v. Commissioner, T.C. Memo. 1985-443↩.
4. There is nothing in the record to explain how the formula used to determine the final payment date, supra↩, affects accrued interest nor are we able to determine such effect.
5. This case at docket No. 32613-83 was the subject of a motion for partial summary judgment filed by respondent. In disposing of the motion we held for respondent finding that the method of accruing interest did not clearly reflect income. Ames v. Commissioner, T.C. Memo. 1985-443↩.
6. Mr. Green first valued the properties in issue as of January 2, 1986, and then adjusted those amounts to arrive at the values of the properties as of the various purchase dates.↩
7. The other petitioners in these cases did not claim depreciation deductions with respect to their purchase of the timeshare units. Accordingly the issue of whether they are entitled to depreciation is not before us.↩